CELTIC LIFE INSURANCE
COMPANY, Appellant,

v.

John D. COATS, Jr., Appellee.

No. 3–90–279–CV.

Court of Appeals of Texas,
Austin.

June 10, 1992.

Rehearing Overruled July 8, 1992.

Alice M. Giessel, Giessel, Stone, Barker & Lyman, Houston, for appellant.

Tim Labadie, Longley & Maxwell, Austin, for appellee.

Before CARROLL, C.J., and ABOUSSIE and KIDD, JJ.

ABOUSSIE, Justice.

This is an appeal from a suit by an insured against his group health insurer, Celtic Life Insurance Company, for misrepresentations made by the insurer's soliciting agent. Suit was brought under the Insurance Code article 21.21 [1] and the Deceptive Trade Practices–Consumer Protec-

---

1. Tex.Ins.Code Ann. art. 21.21, § 16(a) (Supp. 1992).

tion Act (DTPA),[2] and on theories of common-law fraud and misrepresentation. Judgment was rendered on a verdict in favor of the insured. We affirm the judgment.

## THE CONTROVERSY

In August 1984 appellee, John D. Coats, Jr., acquired ownership of Aloha Pools, a swimming pool construction and service company. Aloha had previously been part of a larger company called Swim Pack. When Aloha became a separate entity it fell below the minimum number of employees necessary to continue group health insurance coverage with Swim Pack's insurer. That coverage ceased for Aloha's employees on January 31, 1985.

In September 1984 Coats met with Ken Harrell, an independent insurance agent and Celtic's soliciting agent, to discuss replacement coverage. According to Coats, he told Harrell he was particularly interested in psychiatric benefits equal to or greater than the $20,000 psychiatric benefits available under Swim Pack's policy.

Harrell returned with a brochure describing the coverage and benefits of a policy from Celtic called the "Horizon Plan." Harrell orally summarized the brochure for Coats and discussed the benefits of the plan with Paula Engelmann, Aloha's business manager. Both Coats and Engelmann maintain that Harrell represented to them that the plan's $1 million maximum lifetime benefit applied to in-hospital psychiatric care. On Engelmann's recommendation, Coats purchased the Celtic policy, which became effective February 1, 1985.

Coats's son was admitted to Shoal Creek Hospital for psychiatric care the following August. Only then did Coats discover that Celtic's policy covered only $10,000 of his son's psychiatric treatment. Despite Harrell's further assurances at this time that the in-hospital psychiatric treatment was covered by the $1 million hospitalization limit, Celtic paid only $10,000 of the $27,000 medical expenses.

Coats filed suit seeking to hold Celtic liable for the additional costs of the psychiatric care on theories of common-law fraud and misrepresentation, and under the DTPA and article 21.21. The jury found that Ken Harrell had authority to explain, on behalf of Celtic, the benefits of the insurance policy and had misrepresented the terms, benefits, provisions, or conditions of the policy, which was the producing cause of damages to Coats. The jury failed to find that the misrepresentation was made knowingly or that Celtic authorized Harrell to make representations outside the scope of the written document concerning the insurance policy's terms, benefits, provisions, and conditions.

The trial court rendered judgment on the verdict awarding Coats $27,584.57 in actual damages, consisting of reasonable and necessary medical expenses and prejudgment interest. This amount was trebled under the mandatory treble-damages provision of article 21.21. 1985 Tex.Gen.Laws, ch. 22, § 3, at 395 (Tex.Ins.Code Ann. art. 21.21, § 16(b)(1), since amended). The trial court also awarded Coats attorney's fees and court costs under article 21.21, section 16.

## SUFFICIENCY OF THE EVIDENCE

Celtic's first point of error complains that the evidence was factually insufficient to support the jury's affirmative answer to question number one. As submitted to the jury, this question read:

Did Kenneth Harrell make any misrepresentations concerning the terms, benefits, provisions, or conditions of the insurance policy such as to be a producing cause of damages to John Coats, Jr.,....

The court defined "misrepresentation" to the jury as any of the following:

(1) any untrue statement of a material fact; or

(2) any omission to state a material fact necessary to make the statements made not misleading (considered in the light of the circumstances under which they are made) or;

(3) the making of any statement in such a manner or order to mislead a reason-

---

**2.** Tex.Bus. & Com.Code Ann. § 17.50(a)(3), (4)     (1987).

ably prudent person to a false conclusion of a material fact.

▇ In reviewing the factual sufficiency of the evidence the court must consider and weigh all of the evidence, both supportive of and contrary to the contested finding. *Plas–Tex, Inc. v. U.S. Steel Corp.*, 772 S.W.2d 442, 445 (Tex.1989). The contested findings will be upheld unless we find that: (1) the evidence is too weak to support the finding; or (2) the finding is so against the overwhelming weight of the evidence as to be manifestly unjust. *Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex.1965). We will not substitute our finding for that of the trier of fact merely because we might have reached a different factual conclusion. *Otis Elevator Co. v. Joseph*, 749 S.W.2d 920, 923 (Tex.App.1988, no writ).

▇ After considering all of the evidence in the record we hold that the evidence was sufficient for the jury to conclude that Harrell made untrue statements of material fact, omitted to state a material fact, and made a statement that misled Coats to arrive at false conclusions regarding the policy's coverage, all of which come within the court's definition of misrepresentation.

Coats testified that he told Harrell at their first meeting that he was particularly interested in psychiatric benefits because one of his sons had required psychiatric care and he anticipated that his second son might need similar care. He gave Harrell a brochure explaining Swim Pack's coverage and requested that Harrell find replacement coverage that included psychiatric benefits equal to or greater than the $20,000 available under Swim Pack's policy. Harrell returned with a brochure describing Celtic's Horizon Plan and orally summarized the plan for Coats, comparing Swim Pack's plan limit of $20,000 psychiatric benefits to the Horizon Plan's maximum lifetime hospitalization benefits of $1 million, without mentioning that psychiatric benefits were limited to $10,000. Coats could not remember whether Harrell ever expressly told him that the $10,000 limit on psychiatric care benefits applied only to doctors and not to hospitalization. Coats never read the brochure himself. Even if he had read there was a $10,000 limit, he conceded that he might have bought the policy anyway.

Coats testified that he delegated the responsibility for finding out about the insurance coverage to Engelmann, asking her to go over the brochure, listen to Harrell's presentation, and have Harrell answer her questions. Engelmann never told Coats the substance of her conversations with Harrell about the psychiatric-care benefits; she told him only that she was satisfied with the policy. Coats bought the policy based on Engelmann's opinion.

After his second son was admitted to Shoal Creek Hospital in August 1985 for psychiatric care, Coats discovered for the first time there was a $10,000 limit on psychiatric-care benefits. He called Harrell, who again assured him that he was covered and that the plan covered $1 million of hospitalization. Celtic paid only the $10,000 and Coats paid the remaining $17,-000.

Engelmann testified that she was present when Coats told Harrell at their first meeting that he was interested in psychiatric-care benefits. When she read in the brochure that there was a $10,000 limit on psychiatric benefits she discussed the matter with Harrell. He told her that the $10,000 limit applied only to out-patient psychiatric care while the $1 million hospitalization limit applied to in-patient psychiatric care.

Engelmann agreed that the section of the brochure explaining psychiatric benefits does not specify that the $10,000 limit applies only to out-patient care and that Harrell did not tell her he was authorized to change or alter the terms of the policy. Nevertheless, after reading the brochure and discussing the coverage with Harrell, Engelmann told Coats she was satisfied with the policy.

Harrell was unable to recall the details of his dealings with Coats and Engelmann. He testified that he was not sure whether he told Coats the psychiatric care was limited to $10,000, but he testified he never told anyone there was a $1 million limit on

psychiatric-care coverage, whether in-hospital or at the doctor's office; he knew that the $10,000 applied to all psychiatric care. He never told Coats or Engelmann that he was authorized to do more than explain coverage discussed in the brochure and he had no incentive to trick Coats because his commission was only about sixty dollars per month. He testified that Coats and Engelmann told him at one meeting that they did not have time to sit down and go over all the details of the policy and asked him to leave a brochure for them to review.

Although there was conflicting evidence, the jury was able to hear the testimony and view the demeanor of Coats, Engelmann and Harrell. They apparently found Coats's and Engelmann's versions of the events more persuasive than Harrell's. The jury is the sole judge of the credibility of the witnesses and the weight of their testimony and is free to believe or disbelieve that testimony in whole or in part. *Rego Co. v. Brannon*, 682 S.W.2d 677, 680 (Tex.App.1984, writ ref'd n.r.e.). We overrule Celtic's first point of error.

### RELIANCE

In points of error two and three Celtic complains that the trial court erred in refusing to submit its proposed jury question on reliance and in entering judgment without obtaining a jury finding that Coats relied on Harrell's misrepresentation in deciding to purchase the insurance policy. Celtic argues that there can be no producing cause without a finding that the consumer relied on the misrepresentation. We disagree.

Reliance is not an element that consumers are required to prove in order to recover for misrepresentations under the DTPA. In *Weitzel v. Barnes*, 691 S.W.2d 598, 600 (Tex.1985), the Texas Supreme Court reviewed the legislative history of the 1979 amendments to the DTPA and held that proof of reliance on a misrepresentation is not required before a consumer can recover. *See also Crawford & Co. v. Garcia*, 817 S.W.2d 98, 101 (Tex.App.1991, no writ).

Appellant urges this Court to adopt Justice Gonzalez's dissenting view in *Weitzel*

and hold that reliance is implicit in producing cause and, therefore, should be a necessary element of the plaintiff's proof. *Weitzel*, 691 S.W.2d at 601–02 (Gonzalez, J., dissenting); *see also Brown Foundation Repair & Consulting v. McGuire*, 711 S.W.2d 349, 354 (Tex.App.1986, writ ref'd n.r.e.) (Akin, J., concurring). We decline to do so. Although this Court acknowledges that reliance can be a factor in deciding whether a misrepresentation was a producing cause, and certainly proof of reliance will strengthen a plaintiff's case, reliance is not a necessary element of producing cause that a plaintiff must prove in order to recover damages under the DTPA.

We overrule Celtic's second and third points of error.

### VICARIOUS LIABILITY

By points of error four and five Celtic complains that it was error to hold Celtic vicariously liable for Harrell's misrepresentation. Celtic argues that it is not vicariously liable because Harrell was a soliciting agent, rather than a recording agent. Celtic also argues that it is not liable because Harrell was not authorized to make any representations about policy coverage beyond those made in Celtic's brochure.

Texas law provides two statutory remedies to consumers for misrepresentations by insurance agents. The Insurance Code defines "[m]aking ... any ... statement misrepresenting the terms of any policy issued or to be issued" as an unfair and deceptive act or practice in the business of insurance. Tex.Ins.Code Ann. art. 21.21, § 4(1) (Supp.1992). Violation of article 21.21, section 4, is actionable under either article 21.21, section 16, of the Insurance Code or section 17.50(a)(4) of the DTPA.

In *Royal Globe Insurance Company v. Bar Consultants, Inc.*, 577 S.W.2d 688 (Tex.1979), the Texas Supreme Court held an insurer liable under article 21.21 and the DTPA for misrepresentations made by the insurer's local recording agent. Celtic argues that *Royal Globe* is not determinative because Harrell is a "soliciting agent," not a "local recording agent."

■ The Insurance Code establishes the extent of authority of both types of agents. A soliciting agent's authority is limited to receiving and forwarding applications for insurance; such an agent has no authority to make a contract on behalf of the insurance company or to alter or waive any terms of the policy. Tex.Ins.Code Ann. art. 21.04 (Supp.1992); *see also Guthrie v. Republic Nat'l Life Ins. Co.,* 682 S.W.2d 634, 636 (Tex.App.1984, writ ref'd n.r.e.). The soliciting agent's authority is much more limited than that of the local recording agent, who is additionally authorized to write, sign and execute insurance policies and to bind the insurer. Tex.Ins.Code Ann. art. 21.14, § 2 (Supp.1992); *see also Royal Globe,* 577 S.W.2d at 693. Both soliciting and local recording agents are "agents" of the insurance company. Tex.Ins.Code Ann. art. 21.02 (Supp.1992).

■ Texas courts disagree on whether *Royal Globe* applies when a soliciting agent makes a misrepresentation. *Compare Guthrie,* 682 S.W.2d at 634 and *American Nat'l Life Ins. Co. v. Montgomery,* 640 S.W.2d 346 (Tex.App.1982, writ ref'd n.r.e.) (holding insurer is not liable for misrepresentations of soliciting agent) *with Paramount Nat'l Life Ins. Co. v. Williams,* 772 S.W.2d 255 (Tex.App.1989, writ denied); *Lucadou v. Time Ins. Co.,* 758 S.W.2d 886 (Tex.App.1988, no writ); *Tidelands Life Ins. Co. v. Franco,* 711 S.W.2d 728 (Tex.App.1986, writ ref'd n.r.e.); *and Tidelands Life Ins. Co. v. Harris,* 675 S.W.2d 224 (Tex.App.1984, writ ref'd n.r.e.) (holding insurer liable for misrepresentations of soliciting agent). However, we believe *Royal Globe* does apply to soliciting agents. The focus of the court's rationale in *Royal Globe* was on the agent's authority to sell insurance and in the process to make representations about the policy, an authority both soliciting and local recording agents share:

> Embrey as a local recording agent for Royal Globe, had statutory authority under Article 21.02 and Article 21.14(2) to sell insurance policies for the company and by necessary implication to represent the coverage afforded by such policies to the consumer. If his representations

were false as the trial court here found, under the explicit language of Section 16, Article 21.21 and Section 17.46(b)(12) of the DTPA, his actions constituted a deceptive act or practice for which his principal is accountable.

*Royal Globe,* 577 S.W.2d at 694. We see no logical reason to relieve the insurer of statutory liability merely because the soliciting agent's authority is limited to the sale of policies, while the local recording agent has more extensive authority, none of which contributed to the reasoning in *Royal Globe.*

■ In order to hold the insurance company vicariously liable it must be established that an agent of the insurance company made the misrepresentation and that the agent had actual, implied or apparent authority to make the representation. *Royal Globe,* 577 S.W.2d at 693; *Lucadou,* 758 S.W.2d 886. Celtic does not argue that Harrell is not its agent. The jury found that Harrell had "authority to explain, on behalf of Celtic, the benefits of the insurance policy." Celtic has not attacked this finding on appeal. Thus, the two elements necessary to impose vicarious liability on Celtic under article 21.21 and the DTPA for the misrepresentations of its agent are established in this case. Celtic's fourth and fifth points of error are overruled.

## TREBLE DAMAGES

Celtic's sixth point of error complains that the trial court improperly trebled damages because the jury did not find that Harrell's misrepresentations were made knowingly. Celtic asserts that the cause of action accrued after the April 4, 1985, effective date of the amendment to article 21.21 which requires a finding of knowing violation before damages are trebled. *See* Tex.Ins.Code Ann. art. 21.21, § 16(b)(1).

Originally, both the DTPA and article 21.21 called for mandatory treble damages. In 1979, the DTPA was amended to require that the conduct be committed knowingly before damages in excess of $1000 could be trebled. Tex.Bus. & Com.Code Ann. § 17.-

50(b)(1) (1987). Even then, trebling was discretionary in a standard DTPA case.

One exception to the "knowingly" requirement under the DTPA was a case brought under section 17.50(a)(4) for violations of the Insurance Code article 21.21. In that instance, the Texas Supreme Court held that the DTPA incorporates the Insurance Code in its entirety. *Vail v. Texas Farm Bureau Mut. Ins. Co.*, 754 S.W.2d 129, 132 (Tex.1988). This Court has interpreted the *Vail* decision to mean that § 17.-50(a)(4) incorporated the mandatory treble damage provisions of art. 21.21, § 16(b)(1), despite the discretionary treble damages language in § 17.50(b)(1). *See State Farm Fire & Casualty Co. v. Gros*, 818 S.W.2d 908, 917 (Tex.App.1991, no writ).

■ Article 21.21 was also amended in 1985 to require a finding that the prohibited conduct be committed knowingly. Tex. Ins.Code Ann. art. 21.21, § 16(b)(1). The act amending the Insurance Code provided that the amendment applies to a cause of action that "accrues" on or after the effective date of the act. 1985 Tex.Gen.Laws, ch. 22, § 4, at 396. Thus, only in an action that accrues on or after April 4, 1985, is a plaintiff required to plead and prove that a violation of article 21.21 was committed knowingly.

The jury in this case failed to find that the conduct was committed knowingly. The determinative issue in deciding whether the court erroneously trebled damages is, therefore, when did the cause of action accrue. Celtic argues that the cause of action accrued when the claim was denied in August 1985, citing *Murray v. San Jacinto Agency, Inc.*, 800 S.W.2d 826 (Tex. 1990). *Murray* was a first-party bad-faith case and does not control our decision in this misrepresentation case.

■ It is settled Texas law that a cause of action under the DTPA accrues when the misrepresentation was made. *La Sara Grain Co. v. First Nat'l Bank of Mercedes*, 673 S.W.2d 558, 665 (Tex.1984); *Woods v. Littleton*, 554 S.W.2d 662, 666 (Tex.1977); *State Farm Fire & Cas. Co. v. Gros*, 818 S.W.2d 908, 917 (Tex.App.1991, no writ). Harrell's misrepresentation was made between September 1984, when Harrell first met with Coats, and February 1, 1985, the effective date of the policy. Accordingly, the cause of action accrued before the 1985 amendment became effective, and Coats is not required to show a knowing violation. Celtic's sixth point of error is overruled.

In point of error seven, Celtic asserts that the trial court erroneously trebled prejudgment interest, citing *Vail*, 754 S.W.2d at 137. Appellee responds that while it is improper under *Vail* to calculate prejudgment interest on the trebled damages, it is proper under this Court's opinion in *Paramore v. Nehring*, 792 S.W.2d 210 (Tex.App. 1990, no writ), to treble the amount of actual damages, which includes prejudgment interest.

■ Although this argument initially appears to be merely a matter of semantics, further scrutiny reconciles the apparent conflict between *Vail* and *Paramore*. The confusion stems from the two principles underlying these cases. On the one hand, prejudgment interest may not be awarded on punitive damages. *See Cavnar v. Quality Control Parking, Inc.*, 696 S.W.2d 549, 555 (Tex.1985). On the other, "actual damages," which has been held to include prejudgment interest, are subject to being trebled under the DTPA. *See Benavidez v. Isles Constr. Co.*, 726 S.W.2d 23, 25 (Tex.1987); *see also American Baler Co. v. SRS Systems, Inc.*, 748 S.W.2d 243, 250 (Tex.App.1988, writ denied).

In *Vail*, the trial court erroneously trebled the amount of damages assessed by the jury, then calculated prejudgment interest on that amount. The supreme court, relying on *Cavnar*, held that it was improper to calculate prejudgment interest on the trebled amount of damages.

■ Without distinguishing *Vail*, this Court held in *Paramore* that prejudgment interest, being an element of actual damages, is subject to being trebled under the DTPA. The reasoning applied in *Paramore* is concisely discussed in one commentary as follows:

Recognizing that actual damages recoverable under the DTPA are those damages recoverable at common law, the court [in *Paramore*] relied on the long standing rule that interest as "compensation for detention of that which is due on account of injury inflicted" constitutes common law damages. Such interest thus constitutes actual damages under the DTPA, which may be trebled in appropriate cases.

Michael Curry & Melissa Krakauer, *Deceptive Trade Practices and Commercial Torts*, 45 Sw.L.J. 319, 324 (1991).

In fact, there is no conflict between *Vail* and *Paramore;* although the "bottom line" amount of damages recovered may be the same, the process is distinguishable. The proper process for calculating treble damages under the DTPA without violating the prohibition of *Vail* is to (1) calculate prejudgment interest on the amount of damages assessed in the verdict, (2) add prejudgment interest to the assessed damages to arrive at the total amount of "actual damages," then (3) treble that sum as appropriate.

Having reviewed the judgment, we agree with appellee that the trial court properly calculated damages in this case. Celtic's seventh point of error is therefore overruled.

Finding no reversible error, we affirm the trial court's judgment.