Great American v. MUD 



IN THE COURT OF APPEALS, THIRD DISTRICT OF TEXAS,



AT AUSTIN




 





NO. 3-92-182-CV





GREAT AMERICAN INSURANCE COMPANY,



 
 APPELLANT


vs.





NORTH AUSTIN MUNICIPAL UTILITY DISTRICT NO. 1,



 APPELLEE



 




FROM THE DISTRICT COURT OF TRAVIS COUNTY, 98TH JUDICIAL DISTRICT



NO. 477,113, HONORABLE JOHN K. DIETZ, JUDGE PRESIDING



 




I. INTRODUCTION



 The North Austin Municipal Utility District No. 1 ("MUD"), appellee, filed suit
against Great American Insurance Company ("Great American"), appellant, Underground Utilities
Company ("Underground Utilities"), Dippel Ulmann & Associates, Inc. ("Dippel Ulmann"), and
Smith Pump Company, Inc. ("Smith Pump"), alleging that the defendants had used a defective
component in the construction of a waste-water system for MUD. Following a jury trial, the trial
court rendered judgment in favor of MUD and against all four defendants.

 Great American is the only defendant that perfected an appeal from the trial court's
judgment. On appeal, Great American attacks the judgment on the basis of (1) the determination
of Underground Utilities' underlying liability, from which Great American's liability derives; (2)
the charge submitted to the jury; (3) the applicability of article 21.21 of the Insurance Code, Tex.
Ins. Code Ann. art. 21.21 (West 1981 & Supp. 1993); (4) the sufficiency of the evidence to
support the jury's findings for violations of article 21.21 and the exclusion of evidence pertinent
to Great American's defense to MUD's claims under article 21.21; (5) the award of attorney's
fees; and (6) the inclusion of prejudgment interest as part of MUD's actual damages for purposes
of trebling such damages. We will affirm the judgment of the trial court.



II. FACTUAL AND PROCEDURAL BACKGROUND


 This suit involves a project for the construction of the Rattan Creek Lift Station,
a waste-water lift station. Underground Utilities was the general contractor for the project; Dippel
Ulmann was the engineer; Smith Pump was a subcontractor; and Great American was the
construction surety, furnishing both performance and maintenance bonds on behalf of
Underground Utilities, its principal, and in favor of MUD, its obligee.

 The lift station at issue in the present case consisted of a wet well/dry well
configuration. Under this system, both the wet well and dry well are buried in the ground. The
wet well is fabricated out of poured concrete and serves as a collection tank for waste water
delivered by local gravity pipe lines. The dry well consists of a prefabricated metal container and
houses the pumping equipment used to pump the water from the wet well into a force main pipe
system.

 Before advertising for bids on the project, MUD requested Dippel Ulmann (then
known as Carlson & Dippel, Inc.), which was under contract to provide engineering services for
MUD, to assess the feasibility of refurbishing and relocating an existing dry well owned by MUD
that was scheduled to be taken out of service. After receipt of Dippel Ulmann's initial research,
MUD authorized Dippel Ulmann to proceed. Dippel Ulmann then drafted plans and specifications
for the construction project. The plans did not indicate any specific requirement for the thickness
of the sides for the dry well. In addition, the specifications merely required that the thickness of
the sides be sufficient "for the depth of burial."

 MUD advertised for bids and requested that bidders provide alternative bids: one
for a newly constructed dry well and the other for the refurbishment and relocation of the existing
dry well. The bid package included the plans and specifications prepared by Dippel Ulmann. 
There was no indication in the bid package that the plans and specifications would be varied if the
bid were awarded based on the refurbishment alternative. In August 1987, Underground Utilities
was awarded the contract on the basis of its bid of approximately $360,000 for the refurbishment
and relocation of the existing lift station. Great American then issued a performance bond on
behalf of Underground Utilities and in favor of MUD.

 Underground Utilities hired Smith Pump as a subcontractor to refurbish the existing
dry well. Smith Pump submitted shop drawings to Dippel Ulmann, the engineer, indicating the
manner in which it proposed to refurbish the existing lift station. The shop drawings did not
indicate that Smith Pump would thicken the sides of the dry well. Dippel Ulmann approved the
drawings and Smith Pump performed the work in conformity with the drawings. The refurbished
dry well was then delivered to Underground Utilities. The project was completed, and the lift
station was activated in April 1988. MUD accepted the project as substantially complete in
December 1988.

 The contract between MUD and Underground Utilities provided for a one-year
correction period after MUD's acceptance of the project. This provision required Underground
Utilities to correct or replace any defective work. In connection with Underground Utilities'
obligation under this provision, Great American as surety issued a one-year maintenance bond in
favor of MUD.

 On March 10, 1989, MUD discovered a structural deformity in the "shell" of the
dry well: one of the sides was beginning to collapse. Based on an investigation by a structural
engineer, MUD concluded that the collapse was occurring because the sides of the dry well were
not of sufficient thickness for the depth of burial. MUD requested Underground Utilities to make
repairs pursuant to the correction-period provision of the contract. Underground Utilities refused
to make any repairs, claiming that (1) it had performed all work in accordance with the plans and
specifications; (2) Dippel Ulmann had approved the work; (3) MUD had accepted the work; and
(4) Smith Pump was liable under its manufacturer's warranty for the deformity.

 MUD then informed Great American that the dry well was suffering from a
structural deformity and that Underground Utilities had refused to make repairs. MUD demanded
that Great American perform under the terms of its maintenance bond. Great American responded
that the structural defect was the result of a design defect for which Underground Utilities was not
liable under the terms of the contract. On that basis, Great American asserted that it was not
liable under the terms of the bond. Great American did not take any action to effect repairs or
make any payments to MUD to cover the cost of repairs.

 MUD filed suit, asserting various claims against Underground Utilities, Dippel
Ulmann, Smith Pump, and Great American. The jury found that all four defendants were liable;
that Great American had knowingly engaged in "unfair or deceptive act[s] or practice[s]"; that
MUD's actual damages were $411,400; and that reasonable attorney's fees were one-third of the
amount of MUD's recovery. After adding prejudgment interest, the trial court trebled the
combined damage sum, awarding MUD a total of $1,558,804.80 in damages and $779,402.40 in
attorney's fees against Great American. Great American, as sole appellant, asserts twenty-four
points of error complaining of the trial court's judgment. We will group the points of error and
address each in the following order: (1) Excused Liability; (2) Jury Charge; (3) Applicability of
Article 21.21; (4) Evidence of Article 21.21 Violations; (5) Attorney's Fees; and (6) Prejudgment
Interest.



III. EXCUSED LIABILITY


 In points of error fifteen and sixteen, Great American complains that Underground
Utilities was relieved from any liability to MUD and, as a result, the trial court erred in rendering
judgment against Great American as surety for Underground Utilities. Although Underground
Utilities has not appealed the judgment of the trial court, Great American asserts that any liability
it has to MUD as surety for Underground Utilities is strictly derivative of Underground Utilities'
liability to MUD. Accordingly, if Underground Utilities was relieved from liability, Great
American argues that it, too, is relieved from liability. (1)

 Great American asserts two bases for the argument that Underground Utilities was
relieved from liability. The initial basis is that, in answer to question seven, the jury found that
Dippel Ulmann's negligence proximately caused the occurrence, i.e., the structural deformity. 
Great American contends that, on the basis of this finding, Underground Utilities is relieved from
any liability to MUD. We disagree, for two reasons.

 First, there may be more than one proximate cause of an occurrence. Lear Siegler,
Inc. v. Perez, 819 S.W.2d 470, 471 (Tex. 1991). The trial court specifically recited this rule in
its jury-charge definition of proximate cause. Questions one and two were based on MUD's
breach-of-contract claims. In question one, the jury found that Underground Utilities failed to
furnish and install a lift station with sides of sufficient thickness for the depth of burial. Further,
in question two, the jury found that Underground Utilities failed to correct defective work. The
trial court rendered judgment based on the jury's findings. Although the jury was not asked in
questions one and two whether Underground Utilities' actions proximately caused MUD's
damages, a finding of proximate cause is deemed found by the trial court in such a manner as to
support the judgment. See Tex. R. Civ. P. 279.

 Second, there is an independent ground on which Underground Utilities may be
held liable. Question three was based on MUD's breach-of-warranty claim under the Deceptive
Trade Practices Act (DTPA), Tex. Bus. & Com. Code Ann. § 17.46 (West 1987). In answer to
this question, the jury found that Underground Utilities' breach of warranty was a producing cause
of damages to MUD. This finding provides an independent ground for holding Underground
Utilities liable. The jury's finding that Dippel Ulmann's actions were a proximate cause of
damages to MUD is irrelevant to the issue of Underground Utilities' liability to MUD, because
the jury also found that Underground Utilities' actions were a producing cause of damages under
MUD's DTPA claim. 

 As a second basis for claiming that Dippel Ulmann's negligence relieved
Underground Utilities from liability to MUD, Great American asserts that the evidence
conclusively established that the provisions of the contract relieved Underground Utilities from
any liability based on Dippel Ulmann's negligence. As support for its argument, Great American
points to article 6.1 of the general conditions of the contract:



CONTRACTOR [Underground Utilities] shall be solely responsible for the means,
methods, techniques, sequences and procedures of construction, but
CONTRACTOR shall not be responsible for the negligence of others in the design
or selection of a specific means, method, technique, sequence or procedure of
construction which is indicated in and required by the Contract Documents. 
CONTRACTOR shall be responsible to see that the finished Work complies
accurately with the Contract Documents.



Great American contends that Dippel Ulmann was responsible for the design and selection of the
specific means of construction and, therefore, that Underground Utilities as contractor was not
responsible for Dippel Ulmann's negligence. We disagree. 

 Dippel Ulmann was responsible for preparing the plans and specifications included
in the bid package that formed the basis of the contract. Section III.C.6 of the specifications
indicated that "[t]he thickness of the sides [of the dry well] shall be determined by the structural
requirements for the depth of burial." Likewise, the plans did not specify any particular
measurement for the thickness of the sides, nor did they instruct the contractor to increase the
thickness of the sides of the dry-well shell. The "General Construction Notes" included on the
face of the plans, however, stated that "the standard construction specifications current at the time
of bidding shall govern materials and methods used to do this work."

 Dippel Ulmann identified the standard for determining the thickness of the sides
for the dry-well shell in the specifications, but omitted from the plans any specific measurements
for complying with this specification. Assuming, without deciding, that the plans and
specifications constitute a "design," they were not defective as a whole because the specifications
clearly indicated a requirement for the thickness of the sides of the dry-well shell, and the plans
designated the specifications as controlling.

 Further, the plans and specifications constitute part of the contract documents. The
contract documents required that Underground Utilities provide a dry-well shell with sides of
sufficient thickness for the depth of burial. The partial collapse of one side of the shell tends to
show that the sides were not, in fact, of sufficient thickness for the depth of burial. Since no
specific thickness was "required by the Contract Documents," Underground Utilities remained
responsible for that decision. Moreover, article 6.1 of the contract's general conditions provides
that Underground Utilities, as contractor, "shall be responsible to see that the finished Work
complies accurately with the Contract Documents." We conclude that the foregoing is sufficient
evidence to support a finding that Underground Utilities remained liable despite any negligent
actions on Dippel Ulmann's part. 

 Great American also argues that the evidence conclusively established that
Underground Utilities was relieved from liability because Dippel Ulmann approved Smith Pump's
shop drawings, which identified all modifications necessary for the refurbishment of the lift
station. We disagree. Article 6.27 of the general conditions expressly states that "ENGINEER's
review and approval of Shop Drawings or samples shall not relieve CONTRACTOR from
responsibility for any variation from the requirements of the Contract Documents" unless a
particular procedure is followed, which did not occur in the present case. Further, Dippel
Ulmann placed the following disclaimer on the shop drawings: "This review is for determining
general conformity with the contract plans and specifications and shall not relieve the contractor
of responsibility for deviations from drawings or specifications, or for errors of any sort in the
shop drawings or schedules." Again, the foregoing constitutes some evidence that Underground
Utilities remained liable irrespective of any negligent actions by Dippel Ulmann.

 We overrule points of error fifteen and sixteen.



IV. JURY CHARGE


 In points of error one through fourteen, Great American asserts several complaints
regarding the jury charge. All of Great American's complaints about the charge relate to issues
concerning Underground Utilities' liability under the contract documents. As before, Great
American raises these issues on appeal based on its derivative-liability theory. In other words,
Great American argues that if there was reversible error in the jury charge as to Underground
Utilities, there is also reversible error as to Great American. We address the complaints regarding
the jury charge in the following order: (1) definitions, (2) measure of damages, and (3) omitted
questions/instructions.



1. Definitions

 In points of error one through four, Great American complains that the trial court
incorrectly defined the terms "work" and "defective" in question two of the jury charge relating
to MUD's claim that Underground Utilities failed to correct defective work as required by the
contract. Initially, we note that question two was only one basis for holding Underground
Utilities liable; questions one and three provided alternative bases of liability. The jury found in
answer to question one that Underground Utilities breached the contract by failing to furnish and
install a lift station with sides sufficiently thick for the depth of burial. In answer to question
three, the jury found that Underground Utilities breached either an express or implied warranty
in connection with the construction project. Great American does not directly complain of any
error with regard to questions one and three. (2) When the judgment can be upheld on the basis of
multiple findings, error in only one question does not require a reversal. Spradling v. Williams,
566 S.W.2d 561, 564 (Tex. 1978); Texas & P. Ry. v. Snider, 321 S.W.2d 280, 282-83 (Tex.
1959). In other words, even if the trial court erred in submitting the definitions of "work" and
"defective" in question two, such error was harmless because we can uphold the judgment based
on the jury's answers to questions one and three.

 Assuming arguendo that the jury's findings in questions one and three were not
sufficient to uphold the judgment, however, we conclude that the definitions submitted were
proper. The form of the definitions included in the jury charge rests within the discretion of the
trial court. The applicable standard of review is clear abuse of discretion. Eoff v. Hal & Charlie
Peterson Found., 811 S.W.2d 187, 192 (Tex. App.--San Antonio 1991, no writ); Wolters v.
Wright, 649 S.W.2d 649, 651 (Tex. App.--Texarkana 1982, writ ref'd n.r.e.). 

 Great American argues that the court did not restrict the jury's consideration to the
meaning of the terms as defined by the contract. The charge defined "work" as "the Rattan Creek
Lift Station." Great American objected and submitted the following definition, which was refused
by the trial court:



You are instructed that "work" is the entire completed construction or the various
separately identifiable parts thereof required to be furnished under the Contract
Documents. Work is the result of performing services, furnishing labor and
furnishing and incorporating materials and equipment into the construction, all as
required by the Contract Documents.



(Emphasis added.) This definition tracks the definition of "work" in the contract. Great
American contends that failing to incorporate the contract definition in the charge constitutes
harmful error. We disagree.

 The "Agreement" included in the contract documents described the work contracted
for as the entire completed project. The agreement stated that "[t]he said Party of the Second Part
(CONTRACTOR) hereby agrees with the Party of the First Part (OWNER) to commence and
complete the construction of certain improvements described as follows: NORTH AUSTIN
MUNICIPAL UTILITY DISTRICT NO. ONE RATTAN CREEK LIFT STATION." The
agreement further provided that Underground Utilities would "furnish all the materials, supplies,
machinery, equipment, tools, superintendence, labor, insurance and other accessories and services
necessary to complete the said construction" in compliance with the plans and specifications
included in the contract documents.

 We conclude that the trial court did not abuse its discretion in defining "work" as
"the Rattan Creek Lift Station" for two reasons. First, the agreement indicated that the project
consisted of the construction of the lift station in its entirety. Second, the agreement required
Underground Utilities to furnish everything necessary to complete the project. In other words,
there were no "separately identifiable parts" that Underground Utilities was to furnish under the
contract. The trial court was within its discretion in defining "work" in light of the agreement
between the parties and in limiting the general contract definition to a definition supported by the
specific agreement between the parties.

 Even if we assume that it was error for the trial court to refuse to submit the
definition of "work" as provided in the contract, Great American must demonstrate that such error
was harmfulthat the error was reasonably calculated to and probably did cause the rendition of
an improper judgment. See Tex. R. App. P. 81(b)(1). Great American contends that such
definition constituted harmful error because the jury was not allowed to consider the construction
project in its "various separately identifiable parts" and determine which party was required to
furnish such parts. Great American argued at trial that the dry-well shell did not constitute part
of Underground Utilities' "work" because the dry-well shell was an existing structure owned by
MUD, which MUD was required to furnish under the terms of the contract. We disagree. Even
though the dry-well shell used in the lift station was owned by MUD, the parties' contract
required Underground Utilities to furnish a refurbished lift station, including a dry-well shell, that
complied with the plans and specifications provided in the contract documents. The specifications
required that the sides of the dry-well shell be of sufficient thickness for the depth of burial. In
the context of a refurbishment contract, Underground Utilities was required to furnish a
refurbished dry-well shell with sides sufficiently thick for the depth of burial as part of its "work"
under the contract. The dry-well shell was not a separate part to be furnished by MUD; rather,
it was a part to be furnished by Underground Utilities under the contract. Accordingly, the
definition submitted in the charge did not constitute harmful error because such definition merely
prevented the jury from considering an argument that was legally incorrect. 

 Great American also complains that the trial court abused its discretion in defining
"defective" as "work that is unsatisfactory, faulty or deficient, or does not conform to the contract
and specifications." Great American objected and submitted the following definition, which was
refused by the trial court:



You are instructed that "defective" is an adjective which when modifying the word
Work refers to Work that is unsatisfactory, faulty or deficient, or does not conform
to the Contract Documents, or does not meet the requirements of any inspection,
reference standard, test or approval referred to in the Contract Documents, or has
been damaged prior to ENGINEER's recommendation of final payment (unless
responsibility for the protection thereof has been assumed by OWNER at
Substantial Completion).


This definition tracks the definition of "defective" in the contract. Again, Great American
contends that failing to incorporate the contract definition in the charge constitutes error. We
disagree.

 The definition in the charge incorporated the contract definition, but omitted
matters for which there was no evidence. There was no evidence that the lift station did not meet
the requirements of any inspection, reference standard, test or approval referred to in the contract
documents, or that it was damaged before the engineer's recommendation of final payment. The
trial court was within its discretion in defining "defective" as it was defined in the contract, but
limiting the definition in light of the evidence presented at trial. We overrule points of error one
through four.



2. Measure of Damages

 In points of error five through eight, Great American complains that the trial court
submitted instructions that referenced an improper measure of damages in connection with the jury
question regarding damages that resulted from Underground Utilities' actions. In its fifth point
of error, Great American complains that the trial court abused its discretion in submitting an
explanatory instruction in connection with question four, which instructed the jury to award
damages, if appropriate, based on repair or replacement cost. Great American asserts in points
of error six and seven that "substantial performance" was the appropriate measure of damages and
that the trial court abused its discretion in refusing to submit Great American's requested
instructions based on such measure. (3) We disagree.

 The proper measure of damages is a question of law for the court. Johnson v.
Willis, 596 S.W.2d 256, 262 (Tex. Civ. App.--Waco), writ ref'd n.r.e. per curiam, 603 S.W.2d
828 (Tex. 1980). The charge submitted should limit the jury's consideration to facts that are
properly part of allowable damages. Id. If parties agree to a contractual remedy, such agreement
will be enforced unless illegal or against public policy. See Fidelity & Deposit Co. v. Stool, 607
S.W.2d 17, 23-24 (Tex. Civ. App.--Tyler 1980, no writ); see also Tucker v. Northcutt, 248
S.W.2d 750, 752 (Tex. Civ. App.--Waco 1952, writ ref'd); Sowell v. Natural Gas Pipeline Co.,
604 F. Supp. 371, 380 (N.D. Tex. 1985), aff'd, 789 F.2d 1151 (5th Cir. 1986).

 In article 13.12 of the general conditions of their contract, Underground Utilities
and MUD contracted for a one-year repair or replacement remedy:



If within one year after the date of Substantial Completion . . . any Work is found
to be defective, CONTRACTOR shall promptly, without cost to OWNER and in
accordance with OWNER's written instructions, either correct such defective
Work, or, if it has been rejected by OWNER, remove it from the site and replace
it with nondefective Work.



The structural deformity was discovered within one year after the date of substantial completion. 
Accordingly, article 13.12 applies. Because this provision is neither illegal nor against public
policy, it must be enforced. Based on the parties' agreement, the trial court properly submitted
an instruction using repair or replacement as the appropriate measure of damages and did not err
in refusing Great American's requested instruction. We overrule Great American's points of error
five through seven.

 In point of error eight, Great American also complains that the trial court erred in
failing to submit Great American's requested instruction regarding MUD's obligation to mitigate
damages. The mitigation-of-damages doctrine is based on the concept of avoidable consequences: 
a party may not recover damages that it could have avoided or minimized "at a trifling expense
or with reasonable exertions." Walker v. Salt Flat Water Co., 96 S.W.2d 231, 232 (Tex. 1936);
see also Copenhaver v. Berryman, 602 S.W.2d 540, 544 (Tex. Civ. App.--Corpus Christi 1980,
writ ref'd n.r.e.). However, the breaching party, here Underground Utilities, has the burden to
establish the extent to which damages could have been mitigated. Copenhaver, 602 S.W.2d at
544. Because Great American refers us to no evidence in the record demonstrating that damages
have worsened because of MUD's inaction, the trial court properly refused Great American's
requested instruction. Accordingly, we overrule Great American's eighth point of error.



3. Omitted Questions/Instructions

 In points of error nine through fourteen, Great American complains of various
issues the trial court refused to submit to the jury. 

 In points of error nine and ten, Great American complains that the trial court erred
in refusing to submit either a question or an instruction regarding mutual mistake of fact. An
agreement may be avoided where parties contracted under a misconception or mistake of a
material fact. Williams v. Glash, 789 S.W.2d 261, 264 (Tex. 1990). In order to avoid the
contract, however, the parties must have acted under the same misunderstanding of the same
material fact, i.e., there must be a mutual mistake. Lacy v. Ticor Title Ins. Co., 794 S.W.2d 781,
784 (Tex. App.--Dallas 1990), writ denied per curiam, 803 S.W.2d 265 (Tex. 1991). Under the
present facts, there is no evidence of such a mutual mistake. There is no evidence that MUD
believed the existing dry-well shell used in the refurbishment project complied with the contract
specifications. Further, there is no evidence that MUD contemplated that the completed project
would not comply with the contract specifications. 

 In addition, the doctrine of mutual mistake does not provide a defense to a breach
of contract claim. Rather, it is a ground for rescission of the contract as an equitable remedy. 
Newell v. Mosley, 469 S.W.2d 481, 482-83 (Tex. Civ. App.--Tyler 1971, writ ref'd n.r.e.). 
Where a party retains a beneficial part of the contract, the contract is affirmed and rescission is
barred. Spellman v. American Universal Inv. Co., 687 S.W.2d 27, 30 (Tex. App.--Corpus Christi
1984, writ ref'd n.r.e.). Under the facts of the present case, MUD paid Underground Utilities
in full pursuant to the contract, and Underground Utilities retained the payment. As a result,
rescission of the contract is not available. Accordingly, we overrule Great American's ninth and
tenth points of error.

 In points of error eleven and twelve, Great American complains that the trial court
erred in refusing to submit either a question or an instruction regarding MUD's failure to comply
with its alleged implied warranty of the sufficiency of plans and specifications. Great American
contends that MUD impliedly warranted that the plans and specifications included in the bid
package were accurate and reliable and that MUD breached this warranty. Several courts of
appeals have recognized such an implied warranty. See Shintech, Inc. v. General Constructors,
Inc., 688 S.W.2d 144 (Tex. App.--Houston [14th Dist.] 1985, no writ); Turner, Collie & Braden,
Inc. v. Brookhollow, Inc., 624 S.W.2d 203 (Tex. Civ. App.--Houston [1st Dist.] 1981), rev'd in
part on other grounds, 642 S.W.2d 160 (Tex. 1982); Board of Regents v. S&G Constr. Co., 529
S.W.2d 90 (Tex. Civ. App.--Austin 1975, writ ref'd n.r.e.); Newell, 469 S.W.2d at 482. 

 Assuming such a warranty exists, it does not control our decision here. The facts
of the present case are distinguishable from prior cases imposing this warranty, because
Underground Utilities expressly assumed responsibility for the sufficiency of the plans and
specifications. The "Instructions to Bidders" included in the contract documents required
Underground Utilities to investigate the sufficiency of the plans and specifications. (4) Further, in
its bid proposal, Underground Utilities confirmed that it had fully examined the plans and 


specifications. (5) The language used in the contract documents in the present case is substantially
similar to the language used in the contract documents at issue in Emerald Forest Utility District
v. Simonsen Construction Co., 679 S.W.2d 51 (Tex. App.--Houston [14th Dist.] 1984, writ ref'd
n.r.e.). In that case, the court concluded, based on the contract language, that the contractor had
expressly assumed the responsibility for the sufficiency of the plans and specifications. Id. at 53. 
Similarly, we conclude that Underground Utilities expressly assumed responsibility for the
sufficiency of the plans and specifications pursuant to the contract provisions referred to above. 
The trial court properly refused any requested question or instruction regarding any implied
warranty of plans and specifications. We overrule points of error eleven and twelve.

 In points of error thirteen and fourteen, Great American complains that the trial
court erred in refusing to submit either a question or an instruction regarding agency. Great
American argues that Dippel Ulmann acted as agent for MUD in preparing the plans and
specifications and that Dippel Ulmann's negligence should be imputed to MUD, thereby relieving
Underground Utilities (and Great American) of liability. We disagree.

 Whether an agency relationship exists under established facts is a question of law
for the court to determine in light of the parties' agreement, words, and conduct. Ross v. Texas
One Partnership, 796 S.W.2d 206, 210 (Tex. App.--Dallas 1990), writ denied per curiam, 806
S.W.2d 222 (Tex. 1991). The facts regarding the present contract and the conduct of the parties
were not in dispute. Accordingly, the existence of an agency relationship was a question of law
for the trial court. The evidence demonstrates that Dippel Ulmann was an independent contractor
for MUD rather than its agent. The trial court properly refused Great American's requested
instruction/question regarding agency. We overrule Great American's thirteenth and fourteenth
points of error. (6)



V. APPLICABILITY OF ARTICLE 21.21


 The trial court rendered judgment based on the jury's findings that Great American
engaged in unfair or deceptive acts or practices and failed to deal with MUD fairly and in good
faith. In point of error seventeen, Great American argues that the trial court erred in rendering
judgment against it because article 21.21 of the Insurance Code, Tex. Ins. Code Ann. art. 21.21
(West 1981 & Supp. 1993), does not apply to commercial sureties. The main thrust of Great
American's argument is that a commercial surety is not engaged in the "business of insurance"
for purposes of article 21.21 and, therefore, Great American could not have violated this
provision. We disagree. 

 The purpose of article 21.21 is to "regulate trade practices in the business of
insurance." Tex. Ins. Code Ann. art. 21.21, § 1(a) (West Supp. 1993). Article 1.14-1 of the
Code defines those acts which constitute "doing an insurance business" and expressly includes the
following: "The making of or proposing to make, as guarantor or surety, any contract of guaranty
or suretyship as a vocation and not merely incidental to any other legitimate business or activity
of the guarantor or surety." Tex. Ins. Code Ann. art. 1.14-1, § 2(a)(2) (West Supp. 1993).

 Conceding that its activities fall within the scope of the definition in article 1.14-1,
Great American asserts three arguments why this definition should not apply to article 21.21. 
First, Great American argues that neither article refers to the other or incorporates the other's
definitions. We see no reason, however, to assign different meanings to the phrase "doing an
insurance business" in article 1.14-1 and the phrase "business of insurance" in article 21.21. 
Significantly, neither article excludes the definitions of the other. Had the legislature intended to
exclude sureties from regulation under article 21.21, it could have done so as it has in other
provisions of the Code. For example, article 21.55 applies to "any insurer authorized to do
business as an insurance company," Tex. Ins. Code Ann. art. 21.55, § 1(4) (West Supp. 1993),
but specifically excludes "fidelity, surety or guaranty bonds," Tex. Ins. Code Ann. art. 21.55,
§ 5(a)(4) (West. Supp. 1993). Clearly, the legislature is capable of drawing such distinctions
where it deems necessary. (7)

 Second, Great American argues that the definition in article 1.14-1 should not apply
to article 21.21 because the purposes of the statutes are different. Great American argues that
article 1.14-1 "seeks to define those general business activities which are subject to the overall
jurisdiction of the State Board of Insurance," while article 21.21 "seeks to regulate specific
activities related to the `business of insurance' which the legislature has deemed to be unfair or
deceptive." This is no real distinction. Article 1.14-1 identifies the "business of insurance"
subject to regulation, and article 21.21 specifically regulates trade practices in the business of
insurance, prohibiting unfair and deceptive practices. Accepting Great American's argument
would allow sureties to be "regulated" as entities engaged in the business of insurance, yet would
make it impossible to prohibit them from engaging in unfair or deceptive practices while
conducting this business. We reject this illogical construction.

 Third, Great American argues that federal case law should control our
interpretation of article 21.21's reference to the "business of insurance." Section 1 of article
21.21 states that "[t]he purpose of this Act is to regulate trade practices in the business of
insurance in accordance with the intent of Congress as expressed in [15 U.S.C.A. §§ 1011 to
1015]." We do not believe our analysis is inconsistent either with the purpose of the Insurance
Code as expressed in article 21.21 or with the intent of Congress as expressed in the referenced
sections of the United States Code. 

 Although we have been unable to find any decision directly addressing whether
article 21.21 applies to sureties, one court recently held (without analysis) that an obligee under
a commercial surety bond was entitled to recover damages from a surety for violations of article
21.21. See Lawyers Sur. Corp. v. Royal Chevrolet, Inc., No. 6-92-050-CV, slip op. at 10-11
(Tex. App.--Texarkana January 12, 1993, writ requested) (not yet published). We overrule point
of error seventeen.


VI. SUFFICIENCY OF EVIDENCE OF ARTICLE 21.21 VIOLATIONS


 In points of error eighteen and nineteen, Great American challenges the sufficiency
of the evidence to support the jury's finding that Great American violated article 21.21. In point
of error eighteen, Great American complains that the evidence is legally or factually insufficient
to support the jury's finding that Great American engaged in unfair or deceptive acts or practices. 
MUD identified several misrepresentations Great American made in violation of article 21.21. 
These representations were made in connection with communications between Gregory Kilburn,
Great American's bond claims manager, and Sharlene Collins, MUD's counsel. If the evidence
is sufficient to support any one of the misrepresentations alleged by MUD, the trial court's
judgment must be upheld.

 Collins notified Great American by phone and through correspondence that the lift
station suffered from a structural deformity and that Underground Utilities refused to make
repairs. Included in the correspondence was an engineer's report indicating that the thickness of
the dry-well shell was insufficient for the depth of burial. In response, Kilburn indicated that the
structural deformity was a result of a "design defect," that the project engineer had approved the
"design submittals," and that Underground Utilities "properly installed the lift station and its
equipment in accordance with the contract documents, plans and specifications." As a result,
Kilburn asserted that Great American was not responsible under the terms of its bond. 

 The specifications included in the contract documents required Underground
Utilities to supply a lift station with a dry-well shell of sufficient thickness for the depth of burial. 
We have concluded above that there was no "design defect" that released Underground Utilities
from liability because the specifications were included as part of the "design." Further, there is
ample evidence that Underground Utilities did not install the lift station in accordance with the
contract documents, plans, and specifications. In addition, the "design submittals" Kilburn
referred to were shop drawings, and the contract specifically stated that any approval of such shop
drawings by the engineer would not relieve Underground Utilities from liability for any deviation
from the specifications. The jury was entitled to conclude based on this evidence that Kilburn's
statements constituted misrepresentations in violation of article 21.21. Accordingly, we overrule
point of error eighteen.

 In point of error nineteen, Great American complains that the evidence is legally
or factually insufficient to support the jury's finding that Great American failed to deal with MUD
fairly and in good faith. We concluded above that the evidence was sufficient to support the
jury's finding that Great American engaged in unfair or deceptive acts or practices. Because this
finding is sufficient to support the trial court's judgment, we need not reach point of error
nineteen.

 In point of error twenty, Great American complains that the trial court erred in
excluding evidence relevant to its defense to MUD's claims under article 21.21. MUD was
allowed to introduce evidence that, after MUD demanded Great American's performance under
its bond, MUD and Great American had little or no contact between May 1989 and January 1990,
when suit was filed. However, the trial court excluded evidence tendered by Great American that
demonstrated that MUD's attorneys did not attempt to contact Great American regarding the
defective lift station from early June through August 26, 1989, a period of approximately ten
weeks. Great American argues that MUD's evidence of lack of communication was an attempt
by MUD to prove Great American's intent to repudiate its obligations. Great American claims
that the exclusion of its responsive evidence did not allow the jury to hear all evidence relevant
to the lack of communication between Great American and MUD.

 MUD's failure to contact Great American for a ten-week period is not necessarily
relevant to Great American's failure to communicate with MUD. However, even assuming
arguendo that this evidence was relevant and improperly excluded, Great American has the burden
to demonstrate that such error was harmfulthat such error was reasonably calculated to and
probably did cause the rendition of an improper judgment. Tex. R. App. P. 81(b)(1). We
conclude that any error was not harmful. First, the evidence of lack of communication was only
part of the evidence MUD introduced to establish Great American's article 21.21 violations. 
There was other evidence of such violations, e.g., affirmative misrepresentations. The excluded
evidence provides no defense to misrepresentation. Accordingly, any error in excluding this
evidence was harmless. Second, MUD's evidence demonstrated that there was minimal contact
over an entire eight-month period. The fact that evidence was excluded showing that MUD did
not contact Great American during ten weeks of that eight-month period would not constitute such
an error as would be reasonably calculated to cause the rendition of an improper judgment. 
Accordingly, we overrule Great American's twentieth point of error.

 


VII. ATTORNEY'S FEES


 In points of error twenty-one through twenty-three, Great American complains of
the trial court's award of attorney's fees to MUD. In question seventeen, the jury was asked to
determine MUD's attorney's fees, if appropriate, stated as a percentage of recovery. In response
to this question, the jury answered 33-1/3 percent. 

 In point of error twenty-one, Great American complains that the evidence is legally
or factually insufficient to support the jury's finding to question seventeen. Article 21.21 permits
the recovery of "reasonable and necessary attorneys' fees." Tex. Ins. Code Ann. art. 21.21,
§ 16(b)(1) (West Supp. 1993). The party seeking to recover attorney's fees carries the burden of
proof on this issue. Stewart Title Guar. Co. v. Sterling, 822 S.W.2d 1, 10 (Tex. 1991). 
Attorney's fees may not be awarded, however, unless supported by sufficient evidence. Fairmont
Homes, Inc. v. Upchurch, 704 S.W.2d 521, 525 (Tex. App.--Houston [14th Dist.]), modified &
aff'd, 711 S.W.2d 618 (Tex. 1986).

 At trial, MUD relied on the testimony of two witnesses as evidence to support its
claim for attorney's fees. Sharlene Collins, general counsel for MUD, testified that MUD
engaged counsel on the basis of a contingent-fee contract which specified a 33-1/3 percent
contingency fee. This contract was admitted into evidence. Further, Mark Perlmutter, MUD's
expert witness, testified that the contingent-fee arrangement in this case was a reasonable and
customary fee, "but it's on the low side." 

 Great American does not controvert this testimony. Rather, it claims that this
evidence is insufficient to support the award because there was no evidence presented that would
allow the jury to properly evaluate the reasonableness of the award, e.g., there was no evidence
presented regarding preparation in connection with the case, the novelty or difficulty of the issues
involved in the case, or the level of skill required to effectively try the case. Great American cites
several cases as authority for its argument; however, the cases cited are distinguishable. In three
of the four cases, there was no evidence that a contingency contract existed between the parties. 
See Fairmont Homes, 704 S.W.2d at 526; Wisznia v. Wilcox, 438 S.W.2d 874, 879 (Tex. Civ.
App.--Corpus Christi 1969, writ ref'd n.r.e.); Smith v. Davis, 453 S.W.2d 340, 347 (Tex. Civ.
App.Fort Worth 1970, writ ref'd n.r.e.). In the remaining case, Brown v. De La Garza Service
Center, Inc., 576 S.W.2d 134, 136 (Tex. Civ. App.--Waco 1978, no writ), no evidence
whatsoever was presented; rather, the award of attorney's fees was based on judicial notice of the
reasonableness of the fees requested.

 In contrast, MUD presented evidence that a contingent-fee contract existed,
submitted the contract into evidence, and presented testimony that the particular contract was
reasonable. This uncontroverted evidence was both legally and factually sufficient to support the
award of attorney's fees. See, e.g., Kerrville HRH, Inc. v. City of Kerrville, 803 S.W.2d 377,
388 (Tex. App.--San Antonio 1990, writ denied); March v. Thiery, 729 S.W.2d 889, 897 (Tex.
App.Corpus Christi 1987, no writ); Hochheim Prairie Farm Mut. Ins. Ass'n. v. Burnett, 698
S.W.2d 271, 278 (Tex. App.--Fort Worth 1985, no writ); Liberty Mut. Ins. Co. v. Allen, 669
S.W.2d 750, 755 (Tex. App.--Houston [1st Dist.] 1983, writ ref'd n.r.e.). Accordingly, we
overrule Great American's twenty-first point of error.

 In point of error twenty-two, Great American complains that the trial court erred
in overruling its objection to question seventeen because such question permitted the jury to award
attorney's fees without segregating those fees among the various defendants and various causes
of action. As a general rule, when a party seeks to recover attorney's fees in a case involving
multiple defendants or multiple causes of action, the party is required to segregate its request for
fees among the various defendants and various causes. Stewart Title Guar. Co., 822 S.W.2d at
10-11; Flint & Assocs. v. Intercontinental Pipe & Steel, Inc., 739 S.W.2d 622, 625 (Tex.
App.Dallas 1987, writ denied). An exception to this rule, however, allows a party to forgo
segregating fees where the claims arise out of the same transaction and are so interrelated that the
prosecution or defense requires proof or denial of essentially the same facts. Stewart Title Guar.
Co., 822 S.W.2d at 11. As the Texas Supreme Court explained, "when the causes of action
involved in the suit are dependent on the same set of facts or circumstances and thus are
`intertwined to the point of being inseparable,' the party suing for attorney's fees may recover
the entire amount covering all claims." Id. (emphasis added). 

 Great American argues that the claims against the four defendants were "distinct
causes of action which required the proof of distinct sets of facts." As support for this
proposition, Great American argues that "[t]he claims asserted against Dippel Ulmann,
Underground Utilities and Smith Pump, all related to breach of common law or contractual duties
relating to the construction of the lift station. In contrast, the claims asserted against Great
American involved alleged duties to reasonably and expeditiously evaluate MUD's bond claim." 
We disagree and conclude that all claims relied on the same set of facts. As Great American itself
argued under its excused-liability and jury-charge points of error, its own liability stems from
Underground Utilities' underlying liability. In other words, MUD was required to prove its case
against Underground Utilities in order to recover from Great American. As a result, the same
facts were at issue. We overrule Great American's twenty-second point of error.

 In point of error twenty-three, Great American complains that the trial court erred
in granting attorney's fees to MUD in an amount exceeding the jury's answer to question
seventeen. The trial court awarded MUD $779,402.40 in attorney's fees. Great American argues
that this amount constitutes 50 percent of the $1,558,804.80 in damages MUD recovered from
Great American, rather than the 33-1/3 percent found by the jury to be a reasonable fee.

 The contingent-fee contract expressly provides that attorney's fees would be
calculated as "33-1/3% of the recovery," not the damages, and MUD's expert witness testified
that this arrangement was reasonable. Based on the evidence, the jury found 33-1/3 percent of
MUD's recovery to be a reasonable attorney's fee. The amount a plaintiff is entitled to recover
under article 21.21 is "the amount of actual damages plus court costs and reasonable and
necessary attorneys' fees. If the trier of fact finds that the defendant knowingly committed the
acts complained of, the court shall award, in addition, two times the amount of actual damages." 
Tex. Ins. Code Ann. art. 21.21, § 16(b)(1) (West Supp. 1993). MUD's recovery in this case,
therefore, is treble damages plus a reasonable attorney's fee. In order to enter a proper judgment,
the court must calculate the total amount of recovery so that after one-third of that total is
allocated to attorney's fees, the remaining sum equals the statutorily-required treble damages. 
Any other method of calculating attorney's fees would result in awarding the plaintiff either less
than the 33-1/3 percent fees found by the jury, or less than the treble-damages award required by
the statute. We conclude that the trial court did not err in calculating MUD's attorney's fees. 
Accordingly, we overrule Great American's twenty-third point of error.



VIII. PREJUDGMENT INTEREST


 In point of error twenty-four, Great American complains that the trial court erred
in trebling prejudgment interest as part of MUD's actual damages. This Court has previously
addressed this issue and concluded that when, as here, prejudgment interest is properly an element
of actual damages, it must be included before the trebling of damages. Celtic Life Ins. Co. v.
Coats, 831 S.W.2d 592, 598-99 (Tex. App.--Austin 1992, writ granted); Paramore v. Nehring,
792 S.W.2d 210, 212 (Tex. App.--Austin 1990, no writ). Accordingly, we overrule Great
American's twenty-fourth point of error.




IX. CONCLUSION


 We affirm the judgment of the trial court.



 

 J. Woodfin Jones, Justice

[Before Chief Justice Carroll, Justices Jones and Kidd]

Affirmed

Filed: March 31, 1993

[Publish Parts I, II, V, VII, and IX; Do Not Publish Parts III, IV, VI, and VIII] Entire Opinion
Ordered Published and Released for publication June 15, 1995. Tex. R. App. P. 90(h).
1. MUD argues that Great American is independently liable because of its violations of
article 21.21. Because we address the issue of Underground Utilities' liability substantively
and hold that Underground Utilities was liable, we need not reach this issue.
2. In points of error fifteen and sixteen, Great American asserts that Underground Utilities
was excused from any liability. Even if these points could be considered to be an indirect
complaint as to the jury's answers to questions one and three, we have concluded above that
the argument asserted in points of error fifteen and sixteen is without merit.
3. MUD argues that Great American's objection to the submitted instruction was
insufficient to preserve error because the objection was simply conclusoryit merely asserted
that the measure of damages was improper. We disagree. Great American both objected on
the basis that repair and replacement was the improper measure of damages and also submitted
an instruction identifying substantial performance as the proper measure of damages. By its
actions, Great American sufficiently identified the objectionable matter and the grounds for its
objection. See Tex. R. Civ. P. 274.
4. The Instructions to Bidders provided in pertinent part:


B. Interpretation of Contract Documents and Technical Specifications, and
Plans


Bidders desiring further information, or further interpretation of the Contract
Documents and TECHNICAL SPECIFICATIONS and PLANS must make
request for such information . . . .


C. Conditions of Work


Each bidder is expected to inform himself fully of the construction and labor
conditions under which the work will be performed, and will have inspected the
site and have read and be thoroughly familiar with the Contract Documents,
TECHNICAL SPECIFICATIONS, and PLANS.


Each bidder shall satisfy himself as to the character, quality and quantities of
work to be performed and materials to be furnished. The submission of a
proposal by a bidder shall be conclusive evidence that he has complied with
these requirements. . . .


(Emphasis added.)
5. In its bid proposal Underground Utilities stated:


The undersigned . . . having examined the plans and specifications with the
related documents, having carefully read same, having examined the site of the
proposed project, proposes to furnish all labor, materials, supplies and to
construct the project in accordance with the Contract Documents . . . .


The Contractor, recognizing the importance of this project for the Owner, and
by submitting his bid, confirms . . . that he has examined carefully the plans
and specifications and confirms that they reflect the full intent of all aspects of
the project.


(Emphasis added.)
6. We also note that Dippel Ulmann's negligence could not be imputed to MUD based on
Dippel Ulmann's actions as an independent contractor. Neither an owner or an employer is
liable for the acts of an independent contractor. Ross, 796 S.W.2d at 209 (owner); Phillips
Pipe Line Co. v. McKown, 580 S.W.2d 435, 438 (Tex. Civ. App.--Tyler 1979, writ ref'd
n.r.e.) (employer).
7. Other activities excluded under article 21.55, § 5 fall within the scope of article 21.21. 
See Aetna Casualty & Sur. Co. v. Marshall, 724 S.W.2d 770 (Tex. 1987) (workers
compensation insurance); Stewart Title Guar. Co. v. Sterling, 822 S.W.2d 1 (Tex. 1991) (title
insurance). Logically, the intent of the legislature in excluding particular activities from
regulation under article 21.55 was to exclude activities that would otherwise be considered
within the scope of the Insurance Code.